3-20-0302 The People of the State of Illinois, Appalachia v. Samuel Quintero, Appellant. Thank you. Good morning. Good morning. Ms. Puente? Yes. Are you ready to start? Yes. Good morning, your honors. I'm Stephanie Puente from the Office of the State Appellant Defender. I represent the appellant Samuel Quintero. May it please the court counsel. Samuel Quintero was denied a fair trial where the trial judge relied upon inadmissible evidence in finding him guilty. First, ML's allegations of prior misconduct were inadmissible as prior bad acts because they were not sufficiently similar to the charge conduct or relevant for any of the 404b enumerated purposes. Second, trial counsel's ineffectiveness in impeaching BQ opened the admission of her prior consistent statements and inflammatory evidence contained on the DVD of the VSI or the victim-sensitive interview. Because neither of this evidence, neither of the allegations nor the DVD were admitted for a proper purpose, they improperly bolstered BQ's credibility. Because this case hinged on BQ's credibility, these errors prejudiced Quintero because they tipped the scale in favor of his conviction. Therefore, remand for a new trial is required. Your honors, as to the prior bad acts, the trial judge explicitly refused to admit them as propensity evidence. Therefore, the only way they could be admitted properly at a trial was if they met the criteria for the other four, for the 404b enumerated purposes. However, because the allegations were not sufficiently similar with the charge conduct, they weren't admissible to establish modus operandi, common design, or absence of mistake, nor were they relevant to establish motive. Because there was no proper purpose for the prior bad acts, their admission was an abuse of the trial judge's discretion. Specifically, as to modus operandi, the alleged misconduct against ML could not be used to establish ML or modus operandi because the identity of the offender wasn't at issue. Well, I would agree as to that prong or basis for modus operandi. But can you address the Pitts modus operandi case law? I mean, clearly, identity is not an issue, but there seems to be this other approach or basis for modus operandi. Can you focus on that? Sure, your honor. Yes. Under the Pitts rationale for the modus operandi, the allegations of prior misconduct would not be admissible because there was no showing of a distinctive pattern of misconduct, which would earmark the alleged acts as of the works of Quintero. They were not sufficiently similar to the alleged conduct. For instance, ML did not allege that the events occurred during the same time period. The ones against ML started in 2005 and ended in 2008. For BQ, they started in 2008 and ended in 2006. Additionally, the victims or BQ and ML were of a different age group. The misconduct started when ML was 15 and ended when she was 19. And for BQ, it started when she was six and ended when she was 14. Moreover, ML, unlike BQ, did not allege that Quintero secreted her in a room or walked in on while she was in the shower in order to inappropriately touch her. Also, while BQ testified that the bulk of the misconduct occurred at night, ML did not. ML also did not allege that Quintero's conduct escalated to more serious conduct after he attempted to or successfully got her to touch him. And I think the biggest difference is that ML never alleged that Quintero digitally penetrated her, requested or forced her to perform oral sex, or told her that he wanted to have sexual intercourse with her like he did with BQ. These similarities that the state points out in their response brief, such as BQ and ML being minors, Quintero being in a position of trust, him exposing himself and inappropriately touching the victim, they're common types of characteristics of offenses of this type and are merely descriptive of criminal sexual abuse. So that's what makes this case different than PITS. In PITS, the prior bad acts and the charge offenses were virtually identical. I mean, not only were the victims minor or a minor or the defendant had been in a relationship with the mothers of the girls, but there was just a specific pattern. Like he would commit the, he would go to the homes at midnight. He would trick the girls into doing a chore so he could be alone with them. And then the types of acts and the manner of approach were nearly identical. He would force two of the girls to lie on the floor and he laid on top of two of them. He digitally penetrated two and almost did for a third if he hadn't been interrupted. And he threatened to kill the girls. So that's just, because of these, because the prior allegations by ML are not so unique or distinctive, they just don't qualify under ML. Also, although the state in its response brief did not contest the trial judges ruling that the allegations were inadmissible for the other enumerated 404B purposes, Quintero maintains that they were not admissible for common design, absence of mistake, or motive. Again, as identity was an issue, they shouldn't have come in for common design or absence of mistake. Moreover, for common design, the state never alleged that the prior misconduct against ML was somehow part of a larger criminal design. Can you focus on intent? Sure. Sure. Again, the issue, I guess, would be for the intent is, again, the BQ's credibility was what was at issue. And even the analysis is also the general similarities. So they don't have to be as unique or distinctive for them to come in as ML. But there still has to be similarities. And we would still maintain that the threshold of the similarities is just not there, given the different underlying misconduct, the different ages of the complainants, and the different locations where they took place and the different time. Because they were not, because there was, even the general similarities weren't met, there were met, they shouldn't have come in for intent either. And again, this error was prejudicial because the record rebuts the presumption that the trial court considered only proper evidence. Because the court permitted the state to introduce the other crimes, you know, that ruling, the court was saying that it found that the allegations of ML were proper and worthy of consideration under 404B. Therefore, it cannot be presumed that the evidence did not enter into the court's consideration, given especially the amount of litigation regarding the prior bad acts. There was a motion to eliminate, there was a motion to reconsider. And there was also, it was raised again in the motion for new trial. And also the state relied on ML's prior bad acts testimony in its closing argument. So that further shows that the court considered it. And because there was no proper basis for ML's allegations to qualify as prior bad acts, the court's finding was improper. And again, this case was closely balanced, given that it was a credibility contest between BQ's accusations and Quintero's denials. And there was no physical evidence, no eyewitness to corroborate BQ's testimony. Quintero never made any inculpatory statements and BQ was impeached on some very significant portions of her testimony. Therefore, this error tipped the scale in favor of finding Quintero guilty. Because ML's allegations were not admissible for propensity purposes or as prior bad acts to establish modus operandi or intent, the trial court abused its discretion in relying in them and finding Quintero guilty. Now, your honors, as to the ineffectiveness claim, the record shows that trial counsel acted objectively unreasonable and contrary to his trial strategy, where he opened the door to BQ's prior consistent statements and an inadmissible BSI DVD, which contained inflammatory evidence. So the record does show that counsel's trial strategy was to impeach BQ's credibility by pointing out her delay outcry, her possible motive for fabricating the allegations, such as that she was upset with her father for wanting to move to Texas or for taking away her cell phone, and how she was not forthcoming with Officer Kelly about what type of misconduct occurred during the car ride to the party. However, the fact that the impeachment in these areas was neutralized by counsel's impeachment of BQ as to collateral matters, such as the name of the lotion Quintero allegedly used before forcing BQ to inappropriately touch him. It's a collateral matter. It doesn't add to... So let me just say this. As you well know, we are to defer to trial strategy in a pretty substantial fashion. And as you pointed out a little earlier in your presentation, the entire case comes down to the credibility of BQ. It seems that there's a good argument, and the state makes it obviously, that every single opportunity to impeach BQ is probably worth pursuing, especially given the motive to accuse your father of these horrible offenses. He took my cell phone and he's going to have a baby with another woman. That's not the most compelling motive. So if you want to buttress that, it seems to me it might be good trial strategy to point out every single possible inconsistency. And I think you would concede that there are additional inconsistencies in the VSI. So he goes through those carefully, ad nauseum even. And I agree that in doing so, he buys the consistent statements as you complain about. But that's a weighing that the defense did. At least we should presume it's a weighing because we defer. And if we defer, how is that just not his decision, his trial strategy that we should defer to? I mean, I realize Monday morning quarterbacking, it didn't work out. Now we want to look and say, oh, I don't know, he shouldn't have done that. But that's not really the point of ineffective assistance for trial strategy. Long-winded question, I apologize. But that's kind of the concern that I have. And I'm wondering what you would say. Sure. Ordinarily, we would defer, except in this case, this court shouldn't defer that it's a trial strategy based on what was on the record. When the record shows reveal that counsel was surprised or maybe was even unaware of the legal implications of impeaching BQ on everything, unlike these other minor inconsistencies. What's the basis for presuming that the trial counsel didn't know about the completeness doctrine or the rule? Just the fact that he objected? He objected and he said, Your Honor, I was only trying to impeach the BQ. Therefore, what the state is trying to do is inadmissible or is improper. Maybe he was just hoping the judge was uninformed as to the law. I mean, is that the sole basis for assuming that counsel had no clue that he would invite the rest of the statement? Yes. I mean, that would be the basis on the record that we have that we could affirm would rebut or undermine that this was trial strategy. And I think when viewed with as well with his failure to object to the VSI, it shows that this was not objectively reasonable or wasn't part of his trial strategy. I mean, he agreed to the DVD coming in and it wasn't admissible because BQ had been older than 13 when she made her statement. So it couldn't come in in the case in chief. It's not coming in. It's not coming in substantively, clearly, but was the transcript stipulated to by the parties the accuracy of the transcript? No, Your Honor. So with that reality, the VSI, if there are disputes as to what this transcript showed for purposes of impeachment, isn't that a reason why defense counsel might have thought the judge would benefit from seeing the VSI? That is possible. The only problem with that is that the record again shows that he objected extensively for other prior bad acts coming in, and the video contained uncorroborated allegations of misconduct. So when seeing it in the totality of the record, we would argue that it was unreasonable and ineffective and that it was and that Quintero was prejudiced by this because the court, the trial judge, specifically said she considered it and there's no way to insulate the judge from any potential emotional effect watching the VSI would have on her. Your Honors, the admission, erroneous admission of the prior bad acts, BQ's prior consistent statements, and the DVD were prejudicial and had the effect of repeatedly bolstering BQ's credibility in a case that amounted to a credibility contest between BQ and Quintero. Because these errors were not harmless and denied Quintero a fair trial, this court should remand for a new trial. Thank you, Ms. Puentes. Thank you. Ms. Bella. Good morning, Your Honors. May it please the court. My name is Jamie Bella, and I'm here on behalf of the people of the state of Illinois. As counsel already established, there are two issues. The first being whether the trial court erred in finding the other crimes evidence was sufficiently similar under the theory of modus operandi. Common plan or design not sufficiently probative of the issues of intent, motive, or lack of mistake. So not just modus operandi. The motion was for further. And then second, whether the trial court was ineffective for impeaching the victim with her prior inconsistent statement, as well as the secondary ineffective assistance claim related to the VSI interview as discussed. Turning to the first issue, based on the trial court's ruling on the admissibility of the other the state, I reread the transcript again last night, and I maintain that the there's a concession within there that the crimes were similar. But there's also, it's well established in the arguments by counsel in both the response to the state's motion in limine, as well as the oral arguments, again, in the motion to reconsider the ruling on the admissibility. And again, in the arguments at the hearing on the motion to reconsider that the primary focus of the defense overall with respect to the other crimes evidence was the sheer volume of the evidence and the effect that that would have on to prejudice the defendant because of the sheer volume. So the defense counsel referred to it being excessive, causing confusion for the jurors, and being potentially fabricated. Counsel raised issues regarding whether these victims had come forward in the past, whether the mother was angry and had procured these witnesses to fabricate testimony on behalf of her daughter for the purposes of convicting the defendant. And there are two instances, one in the original hearing on the motion in limine, as well as in the hearing on the motion to reconsider the ruling on the motion in limine, where counsel conceded the similarities, but pursued... Let me just ask you this. He never conceded the similarity with any, excuse the victim, or sorry, any specific other crimes witness. He just said in general, yes, judge, I concede there are some similarities here, but he didn't say as to ML or as to JP or as to any particular one. And we could look at this and obviously, and some are much more similar than others. So let's assume for the sake of our argument today, that there was not a concession as to similarities and address the other aspects of modus operandi and motive and intent specifically. I think the reason I agree that because there was so many witnesses, a lot of the conversation with respect to this... I'm going to be very specific. Because of our limitation in time, I don't want you to discuss similarity. I want you to go to the elements of modus operandi, intent and motive, and say why this evidence was okay without discussing concessions. Well, yes. I think that the amount of discussion in the record with respect to the similarities and how they contribute to modus operandi kind of limits that discussion to the extent that the trial court really didn't participate much in discussing what his take on those similarities were. So on appeal, now we're discussing whether the trial court abuses discretion. While in the transcripts, we don't have a whole lot in terms of what the court determined, except for where the court said outright that these are similar. Well, we do have the testimony of ML and we can compare the testimony of ML to the testimony of BQ. And I think that would be our focus. Yeah, I agree, Your Honor. And I think that there would be more in the way of that if it were not the fact that these issues were not raised in the trial court. So with respect to Marcella ML, so she is the sister of the mother of the victim. So an aunt, I'll call her the aunt. So the victim's aunt, she was a minor when she lived with them. And I think that the focus with the argument that these are not similar offenses is related to whether it was in the kitchen or in the bedroom or in the bathroom or in the stairway. And I think that overall, that's too hyper-focused on a specific, I mean, we're not talking about whether the room was carpeted or had hardwood, we're talking about what did the defendant do. And in general, now when the trial court ruled on this particular motion, it was looking at six victims overall. So we don't have a specific look at just ML, but with respect to ML and all the allegations from BQ over the course of childhood related to the defendant's conduct tend to show us like a general behavior of walking in and exposing himself, asking for these young women to touch him inappropriately, to masturbate him, and the persistence, the discussion about the persistence where if they objected or asked him to stop, he would persist and continue to come at them. There was no threats, never threatened either. And I think that pits with respect to perpetrator itself. We're talking about whether it can identify the conduct, the act, so whether a crime was committed at all. And in that case, both were children, he had access to the children through their mother. In this case, each one of these involve being in the home or in a vehicle where he had the victim under his control, in a sense, and had authority and was able to use that authority to persist as both ML and BQ explained that when they made it clear they did not want him doing this, that he would not stop or he would repeat it again. And I think ML, there's a lot, but I think ML described 20 different occasions regarding that persistence. And BQ describes the same thing where it was on the weekends when she would go to bed, he would get into bed with her, he would expose himself to her, he would give her lotion and ask her to masturbate him, to give him oral sex, and to do other things to please him while she was in his care. ML as the sister was, I think maybe this was, ML might not have been the one that was babysitting. But in general, even if it was not in the kitchen, but was in the bedroom or was not in the bedroom, a lot of that can be explained by looking at the difference in relationships between the two. BQ is the defendant's daughter and the other is his niece. So whether the father is going to go into the bedroom is maybe not a red flag, whereas if he had gone into the bedroom with ML. So we're talking about a person who wants inappropriate access to the victim, but is in a home with other people. His, I don't know if they were married, but BQ's mom would have been in the home. So the difference that counsel points to with regards to whether it happened at night or during the day is almost certainly related to the fact that if the mother was home in the evening, he wouldn't have had access to the child or ML when ML was a child. And the same is true with BQ, where he would have access to her in the evening because she was his child. And I think that the behavior is the thing that has to be focused on, not where they were, not who they told. We're talking about the behavior, the specific behavior of exposing himself, asking them to touch him, actually physically taking their hand and putting it on his penis and asking for them to masturbate him. Those types of behaviors, regardless of where they happened in the home, are the important thing to focus on. And with respect to ML, those facts can be used to show whether a crime occurred if you don't have any dispute about who the perpetrator would have been. And then with respect to the arguments about ineffective assistance of counsel, I think that the record is very clear. And I think, Your Honor, Justice Brennan used the term quarterbacking. So reviewing after the fact, looking back, it is very clear that the primary focus from the defense, through all of the litigation of these motions and at trial, was to discredit BQ's testimony. And that testimony was related directly to the allegations raised in the indictment. So these were not collateral to the extent that if he impeached her with regarding what type of lotion, the allegations are that he forced her to use as collateral as you could call it. It's very directly related to that. And in general, from the beginning of this case through post-trial, counsel's focus remained on discrediting BQ, pointing out the relationships between BQ and the other individuals who came forward as witnesses, all of the evidence from ML, the mother, the interview of the mother where the mother explained that at no point over the course of dropping BQ off to her father and picking her up that she never noticed anything unusual. And counsel repeatedly highlighted these types of discrepancies where if this had been going on for so long, it was such a pervasive problem for the victim, the mother would have noticed. So he highlighted that, highlighted over and again, the amount of times that she had a chance to raise the issue and didn't, the differences in the testimony, but when she first came forward and then what was further established in the VSI. And in the VSI specifically, there was a lot of discussion at the hearing with regard to the VSI. There was four different transcripts in play and the conversation became very convoluted because of the amount of conversation and litigation that had gone on. We had the VSIs, we had the transcripts from the hearings, we had the transcripts from the testimony of the individuals and as all of these things going back and forth and counsel was reasserting again and again that the victim had made a discrepancy, had said this at one point and this at another point, there was a lot of as I think counsel stated when they had the video go back with the judge, I think it's important that that was entirely directed towards this very clear trial strategy of trying to discredit the victim with respect to the very specific allegations that were raised that led to the charges in this case. I think it's directly on point. I don't think it's collateral at all. If there was any, certainly if counsel had to choose between pursuing a strategy to discredit BQ or to pursue a strategy that these instances from the victim and the other and the other crimes evidence was not similar enough, I think that the more appropriate strategy would have been to discredit BQ rather than to go down the path of trying to show a dissimilarity for the purposes of showing MO evidence. So with that, yes? I have a question for you. We've talked about the fact that it was the attorney's to challenge the credibility of BQ. It seems to me that there's an equally important goal that he was pursuing all the time, which was to keep all of this prior bad act testimony out. He worked diligently to do that. I agree. The contradictions that he was pointing out were fairly minimal. And what he let in was gigantic. That was devastating evidence, all of those prior bad acts. And he just let it in and let the judge have it. Similarly, when he allowed, he agreed to let in the DVD, let her consider the DVD. He was giving her access to all of that. How is that not ineffective? Just to clarify the initial part of your question, when you asked about allowing in the testimony of the other crimes evidence, are you referring to ML? Or are you talking about in the VSI video, or are you referring to the allegations from the other crimes witnesses? I'm referring to the fact that by pursuing the impeachment, he opened the door to the other bad act evidence. Well, I know I'm over my time, but I have two answers to that question. The first is when counsel opened the door, I think that opening the door to the testimony to show a prior consistent statement, and then the separate issue of video itself to go in. I think that there's two different considerations there. I think with regard to the prior consistent statement to rebut the allegation that she made a prior inconsistent statement, I think that in terms of pursuing the strategy to discredit BQ, there was no other strategy. Counsel was doing the best that he could with what was available there, and discrediting her, the transcript doesn't come in necessarily because of the collateral issues, or I don't agree that they're collateral, the lotion and those types of things. The bulk overall that counsel was trying to show was this entire thing is a lie, both from the witness or from the victim herself, as well as every person who has come forward with a similar allegation, and they did so on the behest of the mother who was angry because of the new girlfriend and the child, or new wife and the child. Regarding the video, I think that there was a transcript and the video, and I think that when the video went in, there's nothing in there showing that the court went beyond looking at the portions that would clarify the parts that were argued in the hearing. If the issue is when he allows the video to go in, and when he asked the court to review the video, it's regarding this convoluted argument that was going on related to how many people, or I'm sorry, how many transcripts there were. We had the four different transcripts. We had the transcripts from the hearing, the transcripts from the interview, and so as he's talking about putting the video in, and I didn't highlight the specific statement that he made. Could you tighten up your answer a little bit? Sorry, I don't have the testimony or the part of the convoluted part of the argument related to trying to discuss this over four different transcripts on four different dates. I think that it was a limited, I didn't think he allowed it in for all of that. It was for that specific purpose. Okay, thank you. Any other questions for Ms. Bella? No, thank you. Okay, thank you, Ms. Bella. Thank you, Your Honor. Ms. Puentes, any rebuttal? Yes, Your Honor, excuse me. While the allegations of misconduct by Amal may have, if true, were inappropriate, they just weren't strikingly similar. The fact that they involve minors, that the inappropriate touching took place away from adults, and the behavior such as exposing and touching, these are all common features to accusations of criminal sexual abuse. Therefore, they're not so unique or distinctive to establish that they were the handiwork of Mr. Quintero. As to intent, I think what's instructive here is the Quintero cites in his brief to Bobo and intent, there's two factors or there's two scenarios. One is where the defendant does not deny the requisite intent, but admitted to some parts of the act, or also that if he did admit to the underlying acts, but admitted that he was with the complainant. Here, none of that happened. And therefore, it shouldn't have come in for intent. And as addressed earlier, and in opening briefs, the similarities were just not there to establish intent. As to motive, the allegations and the charge conduct, they're too remote, and there was no causal relationship that was established by the state. As to the ineffective assistance of counsel, any time counsel is trying to impeach or support the defense of his client, he engages in a cost-benefit analysis. And here, the cost-benefit analysis was, okay, on the one side, I have to impeach the credibility of EQ. On the other side, I have to keep the prior bad acts testimony out or to a minimum. Let me ask a question. I'm sorry, Justice Heddle, go ahead. Thank you, Justice Brennan. It's a point that I think Justice McDade brought up, and you argued earlier, Ms. Puente. Didn't this judge already rule and exclude five different bad acts that she heard about before? Yes, Your Honor. Did this bring new victims in? Yes, new victims who were never corroborated or verified. I believe it was two other ones who might have been related to BQ. Are you referring to statements in the victim-sensitive interview? Yes, they were in the DVD. My recollection, and by the way, this is not a rhetorical question, I could be wrong, but my recollection from that interview is that there was just a reference that there were other girls in the family that he touched. I didn't recall specific names or that it differentiated from the victims that the state sought to introduce in the motion to eliminate. Am I wrong about that? There was no specific names given, but- And to Justice Petal's point, that's something that Judge Bertani was painfully aware of, given the motion to eliminate. Correct, but there had also been a motion eliminated by the defendant about another situation involving, I believe it was DCFS, about touching, and that wasn't admitted. But there was nothing in the VSI that suggested that. I think you're referring to JP, but I mean, DCFS, was DCFS investigating another family member mentioned in the VSI? We don't know. We don't know because- You don't know? No, because it was uncooperated. They didn't say specifically who it was. So there's nothing in there about that? Well, there is because BQ says that she learned from her mother about somebody else. And if they had been cooperated or if it had been one of the other prior bad acts witnesses that the state wanted to introduce, we would have known about that, right? They didn't- Assuming for the sake of argument that Judge Bertani asked for that VSI because there was discrepancies between the parties about what the transcript said and what was actually in the VSI. And she says, I just want to see the VSI myself. Shouldn't we assume that she limited a review of VSI to those discrepancies, to the transcript issues and didn't consider things beyond those portions for impeachment purposes? We can't do that because the record, it just, we don't know based on the record. On the record- Doesn't the case law say we presume the judge follows the law? Correct. But also because the VSI wasn't admissible and there wasn't authenticated, it wasn't properly before- It's not admissible for substantive purposes under 115.10. Just like the transcript, it was admissible for purposes of impeachment, wasn't it? An alternative? Sure, it could have been, but it would still have had to be part of the record at trial. I mean, it wasn't. There's case law saying that there's a presumption, you rebut the presumption that the trial court didn't consider proper evidence if the evidence wasn't properly part of the record. That is what our position is. Counsel, you said Wallenberg for that proposition on page 40 of your initial brief, but the Wallenberg case wasn't about that at all. The Wallenberg case was a judge who decided to go out on a drive and test the testimony of one of the witnesses and drove down the street and saw that there was a gas station there, but you said it for a purpose that improper. The judge did her investigation, no gas station. I've got some editorials there. It didn't seem that it was supporting your point. Well, it was cited not directly as a case, like as main authority, but it was like as for the general purpose that the court can only consider the evidence that's been part of the record, not record that- Properly considered evidence in the record. In this case, for impeachment purposes, it was proper to consider the victim-sensitive interview as opposed to trying to collaborate or to put together four separate transcripts. That's a proper purpose. You're assuming somehow that then the judge, after hearing all of this evidence about other statements, was somehow affected by maybe an additional unnamed victim. That's your argument, correct? Correct, Your Honor. Because she said she specifically relied on the ESI in finding Quintero guilty. That would be our- Credibility, yes. In finding that she was credible, is what I believe the judge said. I don't want to argue counsel. It looks like our time is about up. Sure. If you have no additional questions, Mr. Quintero would ask for the reasons stated today and in his briefs that he would be granted a new trial because he was denied of a fair trial due to the erroneous admission and consideration of the prior bad acts and the prior consistent statements and the BSIDB. Thank you. Thank you. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue